NATIONAL PROTECTIVE ASSOCIATION OF STEAM FITTERS AND HELPERS et al., Appellants, *v.* JAMES M. CUMMING et al., Respondents, Impleaded with Others.

| 170 | 315 |
|-----|-----|
| 75 AD | 149 |

LABOR UNION — REFUSAL TO PERMIT ITS MEMBERS TO WORK WITH MEMBERS OF RIVAL ORGANIZATION AND ACTION TO COMPEL THEIR DISCHARGE. A labor union may refuse to permit its members to work with fellow-servants who are members of a rival organization, may notify the employer to that effect and that a strike will be ordered unless such servants are discharged, where its action is based upon a proper motive, such as a purpose to secure only the employment of efficient and approved workmen, or to secure an exclusive preference of employment to its members on their own terms and conditions, provided that no force is employed and no unlawful act is committed. If, under such circumstances the employees objected to are discharged neither they nor the organization of which they are members have a right of action against the union or its members.

*Nat. Protective Assn.* v. *Cumming*, 53 App. Div. 227, affirmed.

(Argued January 15, 1902; decided April 1, 1902.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, made July 17, 1900, reversing a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term and granting a new trial.

The nature of the action and the facts, so far as material, are stated in the opinions.

*Andrew J. Shipman* for appellants. The plaintiffs are entitled to an injunction by comparison of their equities with those of the defendants. (*People* v. *Gillson*, 109 N. Y. 389; *Slaughterhouse Cases*, 16 Wall. 116; *Matter of Jacobs*, 33 Hun, 377; 98 N. Y. 98; *Davis* v. *Zimmerman*, 91 Hun, 489; *C. d' A. Co.* v. *Miners' Union*, 51 Fed. Rep. 260; Penal Code, § 168; *Cumberland* v. *Glass Blowers*, 46 Atl. Rep. 210; *Curran* v. *Galen*, 152 N. Y. 37; *Allen* v. *Flood*, L. R. [App. Cas. 1898] 130; *Davis* v. *Engineers*, 28 App. Div. 396; *Leathem* v. *Quinn*, 16 L. T. Rep. 751.) The plaintiffs are entitled to the injunction against the defendants for the invasion of their rights. (*Bowen* v. *Hall*, L. R. [6 Q. B. D.] 338; *M. S. S. Co.* v. *McGregor*, L. R. [23 Q. B. D.] 598; *Perkins* v. *Pendleton*, 90 Me. 166; *Chipley* v. *Atkinson*, 23 Fla. 206; *Angle* v. *C. Ry. Co.*, 151 U. S. 1; *N. Co.* v. *McConnell*, 82 Fed. Rep. 65; *Jones* v. *Stanley*, 76 N. C. 355; *Haskins* v. *Royster*, 70 N. C. 601; *Moran* v. *Dunphy*, 177 Mass. 485; *Rice* v. *Manley*, 66 N. Y. 82.) There is proof of a conspiracy sufficient to entitle the plaintiffs to the injunction. (6 Am. & Eng. Ency. of Law, 864; 1 Eddy on Combinations, 240, § 368; *Keit* v. *Wyman*, 67 Hun, 337, 338; *Griffing* v. *Diller*, 21 N. Y. Supp. 407; *Buffalo Co.* v. *Standard Co.*, 42 Hun, 153; *Hutchins* v. *Hutchins*, 7 Hill, 104; *Saville* v. *Roberts*, 1 Ld. Raym. 378; *Buffalo Co.* v. *Everest*, 30 Hun, 588; *Park & Co.* v. *Drug Assn.*, 30 App. Div. 514; *State* v. *Donaldson*, 32 N. J. L. 157; *Gatzow* v. *Bueening*, 81 N. W. Rep. 1003; *Leathem* v. *Quinn*, 16 L. T. Rep. 753.) The plaintiff, the National Protective Association, is entitled to the injunction against the defendants. (*Society for Savings*

v. *Coite,* 6 Wall. 594; *B. & P. R. R. Co.* v. *F. B. Church,* 108 U. S. 329; *Rector, etc.,* v. *N. Y. El. R. R. Co.,* 21 App. Div. 47; *Matter of Jacobs,* 33 Hun, 377; 98 N. Y. 98; *People* v. *Barondess,* 61 Hun, 585.) The plaintiffs have suffered damage by the acts of the defendants. (*Moore* v. *N. Y. E. R. R. Co.,* 30 Abb. [N. C.] 308; 1 Suth. on Dam. §§ 9, 10; *Searles* v. *Cronk,* 38 How. Pr. 324.)

*Charles Steckler* and *Levin L. Brown* for respondents. A review of the evidence demonstrates that the defendants have committed no unlawful act, and that, in fact, the plaintiffs have even no just nor moral cause for complaint, and that the findings of the trial court were without support in the evidence, these defendants' exceptions thereto being well taken. (Niblack on Soc. § 30; *McKane* v. *Adams,* 123 N. Y. 609; 51 Hun, 629; *People* v. *G. U. Ch.,* 53 N. Y. 109; *White* v. *Brownell,* 4 Abb. Pr. 162; 22 Am. & Eng. Ency. of Law, 811, 812.) Nothing unlawful is alleged in the complaint, and there is in consequence a failure to state a cause of action, and the defendants' motion for a dismissal of the complaint on that ground at the opening of the trial should have been granted, and the exceptions thereto demand the affirmance of so much of the judgment and order of the Appellate Division as is appealed from and the rendition of judgment absolute against the appellants, without considering the merits of the controversy. (*Tooker* v. *Arnoux,* 76 N. Y. 397; *Ketchum* v. *Van Dusen,* 11 App. Div. 332; *Lange* v. *Benedict,* 73 N. Y. 24; *Hollis* v. *D. T. Sem.,* 95 N. Y. 172; *People* v. *Gillson,* 109 N. Y. 399; *Collins* v. *Am. News Co.,* 34 Misc. Rep. 260.) The by-law complained of prohibiting the members of the Enterprise Association from working with non-union men was a lawful exercise of their constitutional rights, and affords no basis for the alleged cause of action. (*Thomas* v. *M. M. P. Union,* 121 N. Y. 45.) The argument of the appellants that any interference with the trade or business of another, irrespective of a consideration of the acts done or the means

employed is unlawful, is not only destructive of constitutional rights, but can be reduced *ex pari ratione* to absurd results, which would in the end be destructive of absolute rights. (Moak's Underhill on Torts, 5, 6; *Butt* v. *I. G. Co.*, L. R. [2 Ch. App.] 158.) The information alleged to have been conveyed to the employers in this case by the delegates of the defendants' associations does not amount in any legal sense to coercion or intimidation. (*Reynolds* v. *P. P. Assn.*, 30 Misc. Rep. 716; *Ulery* v. *C. L. S. Exch.*, 54 Ill. App. 233; *McPherson* v. *Cox*, 86 N. Y. 478; *People* v. *Radt*, 105 N. Y. S. R. 846.) The motive for doing an act cannot of itself change its character from lawful into unlawful. (*Phelps* v. *Nowlen*, 72 N. Y. 39; *Morris* v. *Tuthill*, 72 N. Y. 575; *Bohn Mfg. Co.* v. *N. L. Assn.*, 21 L. R. A. 239; *Reynolds* v. *Plumbers' Assn.*, 30 Misc. Rep. 717; *Collins* v. *Am. News Co.*, 34 Misc. Rep. 260; *Allen* v. *Flood*, L. R. [App. Cas. 1898] 1; *Clinton* v. *Myers*, 46 N. Y. 520; *Lough* v. *Outerbridge*, 143 N. Y. 282; *C. B. Co.* v. *Paige*, 83 N. Y. 178; *Hurwitz* v. *Hurwitz*, 10 Misc. Rep. 355.) The number who unite to do an act cannot of itself change its character from lawful to unlawful. (*B. Mfg. Co.* v. *N. L. Assn.*, 21 L. R. A. 339; *Mathews* v. *Reilly*, 84 N. W. Rep. 840; *Collins* v. *Am. News Co.*, 34 Misc. Rep. 263; *Wunch* v. *Shankland*, 59 App. Div. 482; *Johnston H. Co.* v. *Meinhardt*, 9 Abb. [N. C.] 393; 24 Hun, 489; *Park & Sons Co.* v. *N. D. Assn.*, 54 App. Div. 223; *Krebs* v. *Rosenthal*, 31 Misc. Rep. 661; 56 App. Div. 619; *Davis* v. *United Engineers*, 28 App. Div. 396; *L. P. & Pub. Co.* v. *Howell*, 28 L. R. A. 471; *Rogers* v. *Evarts*, 17 N. Y. Supp. 264; *Reynolds* v. *P. P. Assn.*, 30 Misc. Rep. 716.) The current of authority in this state is against the maintenance of this action, even upon the unwarranted assumption that the allegations of fact contained in the complaint were true. (*Wunch* v. *Shankland*, 59 App. Div. 482; *Davis* v. *United Engineers*, 28 App Div. 396; *Sinsheimer* v. *U. G. Workers*, 77 Hun, 215; *J. H. Co.* v. *Meinhardt*, 9 Abb. [N. C.] 393; *D., L. & W. R. R. Co.* v. *Bowns*, 58 N. Y. 582; *Park & Sons Co.* v. *N. D. Assn.*,

54 App. Div. 223; *Rogers* v. *Evarts,* 17 N. Y. Supp. 264; *Krebs* v. *Rosenstein,* 31 Misc. Rep. 661; *People* v. *Kostka,* 4 N. Y. Cr. Rep. 435; *People* v. *Wilzig,* 4 N. Y. Cr. Rep. 418.) The current of authority in all well-considered cases outside of this state is likewise against the maintenance of this action, even upon the unwarranted assumption that the allegations of fact in the complaint were proved. (18 Am. & Eng. Ency. of Law [2d ed.], 91; *Comm.* v. *Hunt,* 4 Metc. 111; *L. P. P. Assn.* v. *Howell,* 28 L. R. A. 471; *Clemmit* v. *Watson,* 14 Ind. 38; *Payne* v. *R. R. Co.,* 13 Lea, 507; *Heywood* v. *Tillson,* 75 Me. 227; *Bowen* v. *Mattheson,* 14 Allen, 499; *M. B. Assn.* v. *Domascio,* 63 Pac. Rep. 782; *Allen* v. *Flood,* L. R. [App. Cas. 1898] 1; *Quinn* v. *Leathem,* 16 L. T. Rep. 749.) Organizations of workingmen being lawful, courts of justice are not concerned with the expediency of their policies, so long as they are not in conflict with the law. (*Allen* v. *Flood,* L. R. [App. Cas. 1898] 1; *J. H. Co.* v. *Meinhardt,* 9 Abb. [N. C.] 393.) The facts proved did not, in any event, justify the equitable interference of the court. (*D. M. Co.* v. *Roeber,* 106 N. Y. 481; *Hackett* v. *Reynolds Co.,* 30 Misc. Rep. 733; *Leslie* v. *Lorillard,* 110 N. Y. 519; *Hodge* v. *Sloan,* 107 N. Y. 250; *Tode* v. *Gross,* 127 N. Y. 480; *Wood* v. *W. Bros. Co.,* 165 N. Y. 545; *Losee* v. *Clute,* 51 N. Y. 495; *Loop* v. *Fitchfield,* 42 N. Y. 351; *Lough* v. *Outerbridge,* 143 N. Y. 282; *Phelps* v. *Nowlen,* 72 N. Y. 39.) There is an adequate remedy at law for the acts complained of. (*McHenry* v. *Jewett,* 90 N. Y. 62; *Thomas* v. *M. M. P. Union,* 121 N. Y. 45; *L. P. & P. Co.* v. *Howell,* 28 L. R. A. 471; *Reynolds* v. *Everitt,* 144 N. Y. 189; *H. Co.* v. *Meinhardt,* 9 Abb. [N. C.] 395.) The gist of the alleged cause of action being the damage to the plaintiffs, and none such having been proved, the equitable interference of the court was not authorized. (*Hutchins* v. *Hutchins,* 7 Hill, 107; *Lee* v. *Kensell,* 56 Hun, 610; *B. L. O. Co.* v. *Everest,* 30 Hun, 588; *Verplank* v. *Van Buren,* 76 N. Y. 259; *Bayles* v. *Vanderveer,* 11 Misc. Rep. 212; *Quinn* v. *Leathem,* 16 L. T. R. 751; *Martens* v. *Reilly,* 84 N. W. Rep.

840.) The plaintiffs claiming the acts complained of to be criminal, and there being no proof of any interference with their property or rights of a pecuniary nature belonging to them, the court of equity will not interfere. (*Matter of Debs,* 158 U. S. 593; *Harvester Co.* v. *Meinhardt,* 9 Abb. [N. C.] 395; 24 Hun, 489; *Gilbert* v. *Mickle,* 4 Sandf. Ch. 357; *Wood* v. *Kelsey,* 14 Abb. Pr. 106; 18 Abb. [N. C.] 262; *Comm.* v. *Hunt,* 4 Metc. 111; 38 Am. Dec. 346; *M. S. S. Co.* v. *McGregor,* L. R. [21 Q. B. Div.] 514; *Reynolds* v. *Plumbers' Assn.,* 30 Misc. Rep. 716; *People* v. *Canal Board,* 55 N. Y. 390; *Morgan* v. *Binghamton,* 102 N. Y. 500; *Cutting* v. *Gilbert,* 5 Blatchf. 259.) The plaintiffs were not entitled to relief because they sought the aid of a court of equity with unclean hands. (*Sinsheimer* v. *U. G. Workers,* 77 Hun, 215; *Wolf* v. *Burke,* 56 N. Y. 115; *P. M. Co.* v. *P. M. P. Co.,* 135 N. Y. 24.) Various errors were committed by the trial court in receiving evidence which necessitate the affirmance of the judgment. (*Tozer* v. *N. Y. C. & H. R. R. R. Co.,* 105 N. Y. 659; *Grout* v. *Cottrell,* 143 N. Y. 677; *Taylor* v. *N. Y. C. R. R. Co.,* 63 App. Div. 586; *Carlson* v. *Winterson,* 147 N. Y. 652; *Matter of Eysaman,* 113 N. Y. 71; *Sherman* v. *D., L. & W. R. R. Co.,* 106 N. Y. 546; *Anderson* v. *R., W. & O. R. R. Co.,* 54 N. Y. 334; *Purseley* v. *G. M. B. Works,* 56 App. Div. 72.)

PARKER, Ch. J.   The order of the Appellate Division should be affirmed, on the ground that the facts found do not support the judgment of the Special Term.   In the discussion of that proposition I shall assume that certain principles of law laid down in the opinion of Judge VANN are correct, namely :

"It is not the duty of one man to work for another unless he has agreed to, and if he has so agreed but for no fixed period, either may end the contract whenever he chooses. The one may work, or refuse to work, at will, and the other may hire or discharge at will.   The terms of employment are subject to mutual agreement, without let or hindrance from

any one.   If the terms do not suit, or the employer does not please, the right to quit is absolute, and no one may demand a reason therefor.   Whatever one man may do alone, he may do in combination with others, provided they have no unlawful object in view.   Mere numbers do not ordinarily affect the quality of the act.   Workingmen have the right to organize for the purpose of securing higher wages, shorter hours of labor or improving their relations with their employers.   They have the right to strike ; that is, to cease working in a body by pre-arrangement until a grievance is redressed, provided the object is not to gratify malice or inflict injury upon others, but to secure better terms of employment for themselves.   A peaceable. and orderly strike, not to harm others, but to improve their own condition, is not in violation of law."

Stated in other words, the propositions quoted recognize the right of one man to refuse to work for another on any ground that he may regard as sufficient, and the employer has no right to demand a reason for it.   But there is, I take it, no legal objection to the employee's giving a reason, if he has one, and the fact that the reason given is, that he refuses to work with another who is not a member of his organization, whether stated to his employer or not,. does not affect his right to stop work nor does it give a cause of action to the workman to whom he objects because the employer sees fit to discharge the man objected to rather than lose the services of the objector.

.The same rule applies to a body of men who, having organized for purposes deemed beneficial to themselves, refuse to work.   Their reasons may seem inadequate to others, but if it seems to be in their interest as members of an organization to refuse longer to work, it is their legal right to stop.  The reason may no more be demanded, as a right, of the organization than of an individual, but if they elect to state the reason their right to stop work is not cut off because the reason seems inadequate or selfish to the employer or to organized society.   And if the conduct of the members of an organization is legal in itself, it does not become illegal because

the organization directs one of its members to state the reason for its conduct.

The principles quoted above recognize the legal right of members of an organization to strike, that is, to cease working in a body by pre-arrangement until a grievance is redressed, and they enumerate some things that may be treated as the subject of a grievance, namely, the desire to obtain higher wages, shorter hours of labor or improved relations with their employers, but this enumeration does not, I take it, purport to cover all the grounds which will lawfully justify members of an organization refusing, in a body and by pre-arrangement, to work. The enumeration is illustrative rather than comprehensive, for the object of such an organization is to benefit all its members and it is their right to strike, if need be, in order to secure any lawful benefit to the several members of the organization as, for instance, to secure the re-employment of a member they regard as having been improperly discharged, and to secure from an employer of a number of them employment for other members of their organization who may be out of employment, although the effect will be to cause the discharge of other employees who are not members.

And whenever the courts can see that a refusal of members of an organization to work with non-members may be in the interest of the several members, it will not assume, in the absence of a finding to the contrary, that the object of such refusal was solely to gratify malice and to inflict injury upon such non-members.

A number of reasons for the action of the organization will at once suggest themselves in a case like this. One reason apparent from the findings in this case, as I shall show later, is the desire of the organization that its own members may do the work the non-members are performing. And another most important reason is suggested by the fact that these particular organizations, associations of steam fitters, required every applicant for membership to pass an examination testing his competency. Now, one of the objections sometimes

urged against labor organizations is that unskillful workmen receive as large compensation as those thoroughly competent. The examination required by the defendant associations tends to do away with the force of that objection as to them. And again, their restriction of membership to those who have stood a prescribed test must have the effect of securing careful as well as skillful associates in their work, and that is a matter of no small importance in view of the state of the law, which absolves the master from liability for injuries sustained by a workman through the carelessness of a co-employee. So long as the law compels the employee to bear the burden of the injury in such cases it cannot be open to question but that a legitimate and necessary object of societies like the defendant associations would be to assure the lives and limbs of their members against the negligent acts of a reckless co employee, and, hence, it is clearly within the right of an organization to provide such a method of examination and such tests as will secure a careful and competent membership, and to insist that protection of life and limb requires that they shall not be compelled to work with men whom they have not seen fit to admit into their organization, as happened in the case of the plaintiff McQueed.

While I purpose to take the broader ground, which I deem fully justified by the principles quoted, as well as the authorities, that the defendants had the right to strike for any reason they deemed a just one, and further, had the right to notify their employer of their purpose to strike, I am unable to see how it is possible to deny the right of these defendant organizations and their members to refuse to work with non-members, when, in the event of injury by the carelessness of such co-employees, the burden would have to be borne by the injured, without compensation from the employer and with no financial responsibility, as a general rule, on the part of those causing the injury; for it is well known that some men, even in the presence of danger, are perfectly reckless of themselves and careless of the rights of others, with the result that accidents are occurring almost constantly which snuff out the

lives of workmen as if they were candles, or leave them to struggle through life maimed and helpless. These careless, reckless men are known to their associates, who not only have the right to protect themselves from such men, but, in the present state of the law, it is their *duty*, through their organizations, to attempt to do it, as to the trades affording special opportunities for mischief arising from recklessness.

I know it is said in another opinion in this case that " work. men cannot dictate to employers how they shall carry on their business, nor whom they shall or shall not employ ; " but I dissent absolutely from that proposition, and assert that, so long as workmen must assume all the risk of injury that may come to them through the carelessness of co-employees, they have the moral and legal right to say that they will not work with certain men, and the employer must accept their dictation or go without their services.

If it be true, as was recently intimated by the Supreme Court of Pennsylvania in *Durkin* v. *Kingston Coal Co.* (171 Pa. St. 193), that an act of the legislature which undertakes to " reverse the settled law upon the subject and declare that the employer shall be responsible for an injury to an employee resulting from the negligence of a fellow-workman " is unconstitutional — a doctrine from which I dissent (see *Tullis* v. *L. Erie & W. R. R. Co.*, 175 U. S. 348), but which it is possible may receive the support of the courts — then the only opportunity for protection, in the future as well as the present, to workmen engaged in dangerous occupations is through organizations like these defendant associations, which restrict their memberships to careful and skillful men, and prohibit their members from working with members of other organizations which maintain a lower standard or none at all. For the master's duty is discharged if the workman be competent, and for his recklessness, which renders his employment a menace to others, the master is not responsible.

But I shall not further pursue this subject. My object in alluding to it is to emphasize the fact that there are other purposes for which labor organizations can be effectually used

than those quoted above; and also, because it is fairly inferable from the facts found that the members of plaintiff association were objectionable to defendants because not up to the latter's standards, so as to make them eligible for membership in defendant organizations and that this was the motive for defendants' acts in holding a strike and notifying their employer of their intention to do so. But whether this be so or not, when it can be seen from the facts found that such or other motives of advantage to themselves may have prompted defendants' action, a court which can review only upon the law, certainly will not presume that another and an unlawful motive and one not stated in the findings of fact, prompted the action of the organization and its members; in other words, this court cannot import into the findings of fact a fact that is not therein expressed. This is not a case of unanimous affirmance, but one of reversal, and under section 1338 of the Code of Civil Procedure we are to assume that the Appellate Division intended to affirm the facts as found by the trial court, and having so affirmed them it then reversed because they were insufficient in law to support the judgment. It is our duty, therefore, if we discover that the facts as actually found are insufficient to support the conclusion of law, to sustain the action of the Appellate Division in reversing the judgment. (*Nat. Harrow Co.* v. *Bement & Sons*, 163 N. Y. 505, and cases cited.)

In *Bowen* v. *Matheson* (14 Allen, 499) the court had before it on demurrer a declaration in an action where the defendants' business had been practically broken up, and it said: "In order to be good the declaration must allege against the defendants the commission of illegal acts. Its allegations must be analyzed to ascertain whether they contain a sufficient statement of such acts." This was followed by an interesting analysis which resulted in disclosing that no illegal act was alleged notwithstanding the liberal use of such extravagant words and phrases as "maliciously conspiring together," and "fellow-conspirators as aforesaid in pursuance of their conspiracy as aforesaid," whereupon the demurrer was sustained

and a precedent created which should be followed in this case.

Now, before taking up the findings of fact for analysis in the light of the principles quoted above, as was done in *Bowen's* case, and with the view of showing that they do not sustain the judgment of the Special Term, I wish to again call attention to the rules quoted, and particularly to so much of them as intimates that if the motive be unlawful or be not for the good of the organization or some of its members, but prompted wholly by malice and a desire to injure others, then an act, which would be otherwise legal, becomes unlawful. To state it concretely, if an organization strikes to help its members, the strike is lawful. If its purpose be merely to injure non-members, it is unlawful. If the organization notifies the employer that its members will not work with non-members, and its real object is to benefit the organization and secure employment for its members, it is lawful. If its sole purpose be to prevent non-members working, then it is unlawful. I do not assent to this proposition, although there is authority for it. It seems to me illogical and little short of absurd to say that the every-day acts of the business world, apparently within the domain of competition, may be either lawful or unlawful according to the motive of the actor. If the motive be good, the act is lawful; if it be bad, the act is unlawful. Within all the authorities upholding the principle of competition, if the motive be to destroy another's business in order to secure business for yourself, the motive is good; but, according to a few recent authorities, if you do not need the business, or do not wish it, then the motive is bad; and some court may say to a jury, who are generally the triers of fact, that a given act of competition which destroyed A's business was legal if the act was prompted by a desire on the part of the defendant to secure to himself the benefit of it, but illegal if its purpose was to destroy A's business in revenge for an insult given.

But for the purpose of this discussion I shall assume this proposition to be sound, for it is clear to me that, applying

that rule to the facts found, it will appear that the Appellate Division order should be sustained.

While I shall consider every fact found by the learned trial judge I shall consider the findings in a different order, because it seems to me the more logical order.   He finds " that the defendants Cumming and Nugent, while acting in their capacity of walking delegates for their respective associations and members of the Board of Delegates, caused the plaintiff McQueed and other members of the plaintiff association to be discharged by their employers from various pieces of work upon buildings in the course of erection,   *   *   * by threatening the   *   *,  *   employers that if they did not discharge the members of the plaintiff association and employ the members of the Enterprise and Progress associations in their stead, the said walking delegates would cause a general strike of all men of other trades employed on said buildings, and that the defendant Cumming, as such walking delegate, did cause strikes,   *   *   *   in order to prevent the members of the plaintiff association from continuing with the work they were doing at the time the strike was ordered, and that said employers by reason of said threats and the acts of the defendants Cumming and Nugent, discharged the members of the plaintiff association and employed the members of the Enterprise and Progress associations in their stead."

Now there is not a fact stated in that finding which is not lawful within the rules which I have quoted *supra*.   Those principles concede the right of an association to strike in order to benefit its members ; and one method of benefiting them is to secure them employment, a method conceded to be within the right of an organization to employ.   There is no pretense that the defendant associations or their walking delegates had any other motive than one which the law justifies of attempting to benefit their members by securing their employment. Nowhere throughout that finding will be found even a hint that a strike was ordered or a notification given of the intention to order a strike for the purpose of accomplishing any other result than that of securing the discharge of the mem-

bers of the plaintiff association and the substitution of members of the defendant associations in their place. Such a purpose is not illegal within the rules laid down in the opinion of Judge VANN, nor within the authorities cited therein; on the contrary, such a motive is conceded to be a legal one. It is only where the sole purpose is to do injury to another, or the act is prompted by malice, that it is insisted that the act becomes illegal. No such motive is alleged in that finding. It is not *hinted* at. On the contrary, the motive which always underlies competition is asserted to have been the animating one. It is beyond the right and the power of this court to import into that finding, in contradiction of another finding or otherwise, the further finding that the motive which prompted the conduct of defendants was an unlawful one, prompted by malice and a desire to do injury to plaintiffs without benefiting the members of the defendant associations.

I doubt if it would ever have occurred to any one to claim that there was anything in that finding importing a different motive from that specially alleged in the finding, had not the draftsman characterized the notice given to the employers by the associations of their intention to strike as " threats."

The defendant associations, as appears from the finding quoted, wanted to put their men in the place of certain men at work who were non-members working for smaller pay, and they set about doing it in a perfectly lawful way. They determined that if it were necessary they would bear the burden and expense of a strike to accomplish that result; and in so determining they were clearly within their rights, as all agree. They could have gone upon a strike without offering any explanation until the contractors should have come in distress to the officers of the associations asking the reason for the strike. Then, after explanations, the non-members would have been discharged and the men of defendant associations sent back to work. Instead of taking that course, they chose to inform the contractors of their determination and the reason for it.

It is the giving of this information, a simple notification of

their determination, which it was right and proper and reasonable to give, that has been characterized as "threats" by the Special Term, and which has led to no inconsiderable amount of misunderstanding since. But the sense in which the word was employed by the court is of no consequence, for the defendant associations had the absolute right to threaten to do that which they had the right to do. Having the right to insist that plaintiff's men be discharged and defendants' men put in their place if the services of the other members of the organization were to be retained, they also had the right to threaten that none of their men would stay unless their members could have all the work there was to do.

The findings further stated that the defendants Cumming and Nugent were the walking delegates of the defendant associations and as such were members of the board of delegates of the building trades in New York and were, therefore, in control of the matters in their respective trades. The trial court also found "that the defendant Cumming threatened to cause a general strike against the plaintiff association and against the plaintiff McQueed wherever he found them at work, and that he would not allow them to work at any job in the city of New York, except some small jobs where the men of the Enterprise Association *were not employed*, and that he and the defendant Nugent threatened to drive the plaintiff association out of existence."

Now this finding should be read in connection with, and in the light of, the other findings which I have already read and commented on and which show that the purpose of the strike was to secure the employment of members of the defendant associations in the places filled by the members of plaintiff's association, who were willing to work for smaller wages, a perfectly proper and legitimate motive, as we have seen. But if the other findings be driven from the mind while considering this one, which the opinions of the Appellate Division indicate was not justified by the evidence, it will be found that it fairly means no more than that the defendant associations did not purpose to allow McQueed and the members of

his association to work upon any jobs where members of defendant associations were employed; that they were perfectly willing to allow them to have small jobs, fitted perhaps for men who were willing to work for small wages, but that the larger jobs where they could afford to pay, and would pay the rate of wages demanded by defendant associations, they intended to secure for their members alone — a determination to which they had a perfect right to come, as is conceded by the rules which I have quoted.

Having reached that conclusion, defendants notified McQueed, who had organized an association when he failed to pass the defendants' examination, that they would prevent him and the men of his association from working on a certain class of jobs. They did not threaten to employ any illegal method to accomplish that result; they notified them of the purpose of the defendants to secure this work for themselves and to prevent McQueed and his associates from getting it, and in doing that they but informed them of their intention to do what they had a right to do, and when a man purposes to do something which he has the legal right to do, there is no law which prevents him from telling another, who will be affected by his act, of his intention.

A man has a right under the law to start a store and to sell at such reduced prices that he is able in a short time to drive the other storekeepers in his vicinity out of business, when, having possession of the trade, he finds himself soon able to recover the loss sustained while ruining the others. Such has been the law for centuries. The reason, of course, is that the doctrine has generally been accepted that free competition is worth more to society than it costs, and that, on this ground, the infliction of damages is privileged. (*Commonwealth* v. *Hunt*, 4 Metcalf, 111, 134.)

Nor could this storekeeper be prevented from carrying out his scheme because, instead of hiding his purpose, he openly declared to those storekeepers that he intended to drive them out of business in order that he might later profit thereby. Nor would it avail such storekeepers, in the event of their

bringing an action to restrain him from accomplishing their ruin by underselling them, to persuade the trial court to characterize the notification as a "threat," for on review the answer would be : A man may threaten to do that which the law says he may do, provided that, within the rules laid down in those cases, his motive is to help himself.

A labor organization is endowed with precisely the same legal right as is an individual to threaten to do that which it may lawfully do.

Having finished the discussion of the facts, I reiterate that, within the rules of law I have quoted, it must appear, in order to make out a cause of action against these defendants, that in what they did they were actuated by improper motives, by a malicious desire to injure the plaintiffs. There is no such finding of fact, and there is no right in this court to infer it, if it would, and from the other facts found, it is plain that it should not, if it could.

The findings conclude with a sentence which commences as follows : "I find that the threats made by the defendants and the acts of the said walking delegates in causing the discharge of the members of the plaintiff association by means of threats of a general strike of other workmen, constituted an illegal combination and conspiracy."— That is not a finding of fact, but a conclusion of law that the trial court erroneously, as I think, attempted to draw from the facts found, which I have already discussed, and which clearly, in my judgment, require this court to hold that the defendants acted within their legal rights.

In the last analysis of the findings, therefore, it appears that they declare that members of the organizations refused to work any longer (as they lawfully might); that they threatened to strike (which was also within their lawful right), but without any suggestion whatever in the findings that they threatened an illegal or unlawful act. And such findings are claimed to be sufficient to uphold a judgment that absolutely enjoins the defendant associations and their members from striking. This is certainly a long step in advance of any decision brought to my attention.

I have refrained from discussing the authorities because it seemed unnecessary, for the reason already stated in this opinion. · But it seems not out of place to suggest that the decisions of the English courts upon questions affecting the rights of workmen ought, at least, to be received with caution, in view of the fact that the later ones are largely supported by early precedents which were entirely consistent with the policy of the statute law of England, but are hostile not only to the statute law of this country, but to the spirit of our institutions. In support of this view reference to a few early statutes of England will be made.

The statutes (for there are two) of Labourers, passed in 1349 and 1350 (23 Edw. III, and 25 Edw. III, st. 1) provided: " that every man and woman of what condition he be, free or bond, able in body, and within the age of three score years," and not having means of his own, " if he in convenient service (his estate considered) be required to serve, he shall be bounden to serve him which so shall him require." And the statutes provide that in case of refusal to serve, punishment by imprisonment might be inflicted, and that the laborer should take the customary rate of wages and no more. These statutes not only regulated the wages of laborers and mechanics, but they confined them to their existing places of residence and required them to swear to obey the provisions of the statutes. Sir James Fitzjames Stephen, in his History of the Criminal Law of England (Vol. III, page 204), says, " the main object of these statutes was to check the rise in wages consequent upon the great pestilence called the black death."

Nearly 200 years later, and in 1548, a more general statute was passed which forbade all conspiracies and covenants of artificers, workmen or laborers, " not to make or do their work but at a certain price or rate," or for other similar purposes, under the penalty, on a third conviction, of the pillory and loss of an ear, and to " be taken as a man ' infamous.' " (2 & 3 Edw. VI, c. 15.)

Fourteen years later the prior statutes were to some extent amended and consolidated into a longer act, entitled " An Act

containing divers orders for artificers, laborers, servants of husbandry, and apprentices." It provided, in effect, that all persons able to work as laborers or artificers and not possessed of independent means or other employments, are bound to work as artificers or laborers on demand. The hours of work are fixed; power is given to the justices in their next session after Easter to fix the wages to be paid to mechanics and laborers; elaborate rules are laid down as to apprenticeship, and it further provides that for the future no one is to "set up, occupy, use or exercise any craft, mystery or occupation now used" until he has served an apprenticeship of seven years. (5 Eliz. c. 4.) This statute remained in force practically for a long period of time and was not formally repealed until the year 1875.

In the year 1720 an act was passed declaring all agreements between journeymen tailors "for advancing their wages, or for lessening their usual hours of work" to be null and void, and subjecting persons entering into such an agreement to imprisonment with or without hard labor for two months. (7 Geo. I, st. 1, c. 13.) Similar enactments were passed as to employees in other manufactures and trades.

The act of 1800 (40 Geo. III, c. 60) provided for a penalty of three months imprisonment without hard labor or two months with hard labor for every journeyman, workman or other person who "enters into any combination to obtain an advance of wages, or lessen or alter the hours of work * * * or who hinders any employer from employing any person as he thinks proper, or who being hired refuses without any just or reasonable cause to work with any other journeyman or workman employed or hired to work." The same penalty is inflicted upon persons who attend meetings held for the purpose of collecting money to further such effort, and the act also makes it an offense to assist in maintaining men who are on strike. This statute, as well as the others referred to, have at last been swept away, but necessarily their influence has been not inconsiderable in shaping the decisions of the courts of England.

The order should be affirmed and judgment absolute ordered for defendants on the plaintiffs' stipulation, with costs.

GRAY, J. I express my concurrence with the conclusion, which has been reached by the chief judge in his opinion, that the order of the Appellate Division should be affirmed.

Briefly stated, my view is that the respondents had the legal right to accomplish their object by all methods not condemned by the law. That object was to secure the employment of the members of their own association, in preference to, and to the exclusion of, those of the appellant association They infringed upon no law in declaring to the employers of members of the appellant organization that they refused to work with them; or that they would abandon their work unless the others were discharged; or in preventing the members of the appellant association from being employed as steam fitters. The case is not within the principle of *Curran* v. *Galen*, (152 N. Y. 33). Upon the facts of that case, as they were admitted by the demurrer to the complaint, the plaintiff was threatened, if he did not join a certain labor organization, and so long as he refused to do so, with such action as would result in his discharge from employment and in an impossibility for him to obtain other employment anywhere and, in consequence of continuing his refusal to join the organization, his discharge was procured through false and malicious reports, affecting his reputation with members of his trade and with employers. There is no such compulsion, or motive, manifest here. There is no malice found. There is no threat of a resort to illegal methods. We may assume, (and the evidence would justify the assumption), that the action of the respondents was based upon a proper motive, relating to the employment of mechanics whose competency and efficiency had been examined into and approved. The contest is between rival labor organizations, it is true. The respondents have succeeded, through the threat that other workmen would leave their work, if the members of the appellant organization were not discharged, in procuring the

employment of the members of their own association. But no unlawful means were taken; nor were any illegal acts committed in bringing about that result. It was not an effort to compel the members of the appellant organization to join the respondents' association, as a condition of being allowed to work. There is no finding to that effect. On the contrary, it appears that the appellant, McQueed, having failed to pass the required examination to become a qualified member of the respondents' association, proceeded to organize an association of his own. Regarded either as an effort to secure only the employment of efficient and approved workmen, or as a mere struggle for exclusive preference of employment, on their own terms and conditions, from either standpoint how can it be said to be within the condemnation of the law, or of any statute, when there was no force employed, nor any unlawful act committed? Our laws recognize the absolute freedom of the individual to work for whom he chooses, with whom he chooses and to make any contract upon the subject that he chooses. There is the same freedom to organize, in an association with others of his craft, to further their common interests as workingmen, with respect to their wages, to their hours of labor, or to matters affecting their health and safety. They are free to secure the furtherance of their common interests in every way, which is not within the prohibition of some statute, or which does not involve the commission of illegal acts. The struggle on the part of individuals to prefer themselves, and to prevent the work which they are fitted to do from being given to others, may be keen and may have unhappy results in individual cases; but the law is not concerned with such results, when not caused by illegal means or acts.

I concur with the chief judge in his analysis of the decision of the trial court and that the facts, as therein stated, do not compel the legal conclusion which the learned trial judge reached.

I vote for the affirmance of the order of the Appellate Division.

VANN, J. (dissenting). The National Protective Association of Steam Fitters and Helpers is a domestic corporation, organized to furnish competent steam fitters and helpers in all branches to the general public, to protect its members in the pursuit of that business and for other purposes. The plaintiff Charles McQueed is a member of that corporation, and sues for the benefit of himself and his fellow-members. The defendant O'Brien is the president of the Board of Delegates; the defendant Duff is the treasurer of the Enterprise Association of Steam Fitters; the defendant Mallaney is the treasurer of the Progress Association of Steam Fitters and Helpers; the defendant Cumming is an officer known as the walking delegate of the Enterprise Association; the defendant Nugent is the walking delegate of the Progress Association, and both Cumming and Nugent are *ex-officio* members of the board of delegates. Each of these associations is unincorporated and consists of more than seven members.

This action was brought to restrain the defendants from preventing the employment of the plaintiff corporation or its members, and from coercing their discharge by any employer through threats, strikes or otherwise, and to recover damages with other relief.

The issues joined by the answers of the several defendants were tried at Special Term. The trial justice adopted the short form of decision, but in stating the grounds upon which he proceeded, found specifically " that the defendants have entered into a combination which in effect prevents and will continue to prevent the plaintiff McQueed, and the other members of the plaintiff association from working at his or their trade in the city of New York; * * * that the defendant Cumming threatened to cause a general strike against the plaintiff association and against the plaintiff McQueed wherever he found them at work, and that he would not allow them to work at any job in the city of New York, except some small jobs where the men of the Enterprise Association were not employed, and that he and the defendant Nugent threatened to drive the plaintiff association out of

existence; * * * that the defendants Cumming and Nugent, while acting in their capacity of walking delegates for their respective associations and members of the Board of Delegates, caused the plaintiff McQueed and other members of the plaintiff association to be discharged by their employers from various places of work upon buildings in the course of erection by (naming three different employers who were erecting buildings at different places in the boroughs of Brooklyn and Manhattan), by threatening the said employers that if they did not discharge the members of the plaintiff association and employ the members of the Enterprise Progress Association in their stead, the said walking delegates would cause a general strike of all men of other trades employed on said buildings, and that the defendant Cumming as such walking delegate did cause strikes * * * in order to prevent the members of the plaintiff association from continuing with the work they were doing at the time the strike was ordered, and that the said employers by reason of said threats and the acts of the defendants Cumming and Nugent, discharged the members of the plaintiff association * * * and employed the members of the Enterprise and Progress Association in their stead * * *; that the threats made by the defendants and the acts of said walking delegates in causing the discharge of the members of the plaintiff association by means of threats of a general strike of other workingmen, constituted an illegal combination and conspiracy, injured the plaintiff association in its business, deprived its members of employment and an opportunity to labor, prevented them from earning their livelihood in their trade or business * * *."

A judgment was directed and entered restraining the defendants from "preventing the work, business or employment of the plaintiff corporation or any of its members in the city of New York or elsewhere, and from coercing or obtaining by command, threats, strikes or otherwise, the dismissal or discharge by any employer, contractor or owner, of the members of the plaintiff corporation, or the plaintiff McQueed, or any or either of them from their work, employment or business,.

or in anywise interfering with the lawful business or work of the plaintiff corporation or of its members. But the defendants are not, nor is any one of them, enjoined and restrained from refusing to work with the plaintiff or any member of the plaintiff corporation."

The Appellate Division, according to its order, which is the only evidence of its action that we can consider, did not reverse upon a question of fact, and a reversal upon the law only is an affirmance of the facts found, which are thus placed beyond our control, as there was some evidence to support the findings. (*People* v. *Adirondack Railway Company*, 160 N. Y. 225, 235; Code Civ. Pro. § 1338.)

Thus we have before us a controversy, not between employer and employee, but between different labor organizations, wherein one seeks to restrain the others from driving its members out of business and absolutely preventing them from earning a living by working at their trade, through threats, made to the common employer of members of all the organizations, to destroy his business unless he discharged the plaintiff's members from his employment.

The primary question is whether the action of the defendants was unlawful, for a lawful act, done in a lawful manner, cannot cause actionable injury. It is not the duty of one man to work for another unless he has agreed to, and if he has so agreed, but for no fixed period, either may end the contract whenever he chooses. The one may work, or refuse to work, at will, and the other may hire or discharge at will. The terms of employment are subject to mutual agreement, without let or hindrance from any one. If the terms do not suit, or the employer does not please, the right to quit is absolute, and no one may demand a reason therefor. Whatever one man may do alone he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of the act.

Workingmen have the right to organize for the purpose of securing higher wages, shorter hours of labor or improving their relations with their employers. They have the right to

strike, that is, to cease working in a body by pre-arrangement until a grievance is redressed, provided the object is not to gratify malice or inflict injury upon others, but to secure better terms of employment for themselves.   A peaceable and orderly strike, not to harm others but to improve their own condition, is not a violation of law.   They have the right to go farther and to solicit and persuade others, who do not belong to their organization and are employed for no fixed period, to quit work also, unless the common employer of all assents to lawful conditions, designed to improve their material welfare.   They have no right, however, through the exercise of coercion, to prevent others from working.   When persuasion ends and pressure begins the law is violated, for that is a trespass upon the rights of others and is expressly forbidden by statute.   (Penal Code, § 168.)   They have no right, by force, threats or intimidation, to prevent members of another labor organization from working, or a contractor from hiring them, or continuing them in his employment. They may not threaten to cripple his business unless he will discharge them, for that infringes upon liberty of action and violates the right which every man has to conduct his business as he sees fit, or to work for whom and on what terms he pleases.   Their labor is their property to do with as they choose, but the labor of others is their property in turn and is entitled to protection against wrongful interference.   Both may do what they please with their own, but neither may coerce another into doing what he does not wish to with his own.   The defendant associations made their own rules and regulations, and the plaintiff corporation did the same. Neither was entitled to any exclusive privilege, but both had equal rights according to law.   The defendants could not drive the plaintiff's members from the labor market absolutely, and the plaintiff could not drive the defendant's members therefrom.   The members of each organization had the right to follow their chosen calling without unwarrantable interference from others.   Public policy requires that the wages of labor should be regulated by the law of competition

and of supply and demand, the same as the sale of food or clothing. Any combination to restrain " the free pursuit in this state of any lawful business," in order " to create or maintain a monopoly," is expressly prohibited by statute, and an injunction is authorized to prevent it. (*Matter of Davies,* 168 N. Y. 89, 96; L. 1897, ch. 383; L. 1899, ch. 690.)

A combination of workmen to secure a lawful benefit to themselves should be distinguished from one to injure other workmen in their trade. Here we have a conspiracy to injure the plaintiffs in their business, as distinguished from a legitimate advancement of the defendants' own interests. While they had the right by fair persuasion to get the work of the plaintiff McQueed, for instance, they had no right, either by force or by threats, to prevent him from getting any work whatever, or to deprive him of the right to earn his living by plying his trade. Competition in the labor market is lawful, but a combination to shut workmen out of the market altogether is unlawful. One set of laborers, whether organized or not, has no right to drive another set out of business or prevent them from working for any person, upon any terms satisfactory to themselves. By threatening to call a general strike of the related trades, the defendants forced the contractor to discharge competent workmen, who wanted to work for him, and whom he wished to keep in his employment. They conspired to do harm to the contractor in order to compel him to do harm to the plaintiffs, and their acts in execution of the conspiracy caused substantial damage to the members of the plaintiff corporation. While no physical force was used, the practical effect was that members of one labor organization drove the members of another labor organization out of business and deprived them of the right to labor at their chosen vocation. Depriving a mechanic of employment by unfair means is the same in principle as depriving a tradesman of his customers by unfair means, which has always been held a violation of law.

A conspiracy is a combination to do an illegal act by legal means, or any act by illegal means. Here, the means used

were illegal, because they tended and were designed to injure a man in his business, without lawful excuse. A threat, whether made by one alone, or by many acting in combination, to injure a man in his business, unless he will conduct it in a way that he does not wish to, is a tortious act, because it interferes with business freedom, and if it results in injury it is actionable. Every man has the right to carry on his business in any lawful way that he sees fit. He may employ such men as he pleases and is not obliged to employ those whom, for any reason, he does not wish to have work for him. He has the right to the utmost freedom of contract and choice in this regard, and interference with that freedom is against public policy, because it tends not only to destroy competition, but in a broad sense, to deprive a man of both liberty and property. (*People* v. *Gillson*, 109 N. Y. 389, 399 ; *Slaughter House Cases*, 16 Wall. 116, 122.) Threatening, molesting, intimidating and obstructing others in their trade or calling is contrary to law, because it is in violation of personal rights, in restraint of trade and injurious ·to society. It tends to force able-bodied and competent workmen into idleness and prevent them from helping to do the work of the country. Workmen cannot dictate to employers how they shall carry on their business, nor whom they shall or shall not employ. The plaintiff's men had the right to work without molestation by members of other labor unions, exercised either directly against themselves, or indirectly through their employers. They had the right to have their relations with their employers left undisturbed and this right was intentionally invaded by the defendants without lawful justification. The object was evil, for it was not to compete for employment by fair means, but to exclude rivals from employment altogether by unfair means. The law gives all men an equal chance to live by their own labor, and does not permit one labor union to seize all the chances by compelling employers to refuse employment to the members of all other unions. The plaintiffs do not ask for protection against competition, but from " malicious and oppressive interference " with their right to work at their trade.

The object of the defendants was not to get higher wages, shorter hours or better terms for themselves, but to prevent others from following their lawful calling. Thus, one of the defendants said to the plaintiff McQueed; "I will strike against your men wherever I find them, and not allow them to work on any job in the city, except some small place where the Enterprise men are not employed."

The same man said to one of the contractors that he could not have the plaintiff's men in his employment, and unless they were discharged he would order a "general strike of the whole building." They were discharged accordingly, although the contractor testified that they were good workmen; that their work was satisfactory, and that he had no reason for discharging them other than the threats made. Another contractor testified that two of the defendants told him that he must take the plaintiff's men off and put their men on, "or else the whole building would be tied up, as they would not allow the other men to work." The usual discharge followed, although the men were satisfactory to their employer. The same witness testified that " Mr. Cumming would neither allow my men to work, nor would he allow his men to go to work until the time had been paid for between the interval they struck and the time they were to go to work again."

A member of the plaintiff corporation swore that " Mr. Cumming told us that if he ever found us on a job in the vicinity of New York, he would strike it by order of the Board of Delegates. He said they would not allow us to work on any job, except it was a small job, a cheap job, and he allowed us to do it." The threat was repeated in substance to the employer, who discharged the witness and he was not employed on the building afterward.

There was other evidence to the same effect, and although the defendants denied making these threats, the trial judge accepted the version of the plaintiff's witnesses, and, hence, we must do the same. I assume, therefore, that the defendants caused the discharge of the plaintiff's men by threatening to cripple their employer's business unless he discharged them,

and that they also molested them by threatening to prevent them from working at their trade in the city of New York, by calling a general strike of all trades on any building where they might be employed. The action of the defendants was wrongful and malicious, and their object was to force men, who had learned a trade, to abandon it and take up some other pursuit. There is no finding that the defendants maintain a higher standard of skill than the plaintiffs.

It may be argued that the employers were not obliged to yield to these threats, and this is true; but non-compliance meant ruin to them, for their work would be completely tied up and their business paralyzed. · A threat, with ruin behind it, may be as coercive as physical force. The effect of such threats upon men of ordinary nerve is well known. They could not perform their contracts and would thus be subjected to great loss. Hence, against their will, they yielded to unlawful demands. Personal liberty was interfered with through coercion of the will. Some of them knew from experience, as the record shows, that the military discipline of the defendant organizations practically compelled instant obedience of an order to strike. When an association is so strong and its discipline so perfect that its orders to strike are equivalent to the commands of an absolute monarch, the effect is the same as the use of physical force. (Tiedeman's State and Federal Control of Persons and Property, vol. 1, p. 433; Erle on Trade Unions, 12, 105.)

The purposes of the defendants, as well as the methods pursued by them, were ·unlawful and authorized the injunction granted by the trial court, in order to prevent irreparable injury and a multiplicity of suits. This was conceded in *Reynolds* v. *Everett* (144 N. Y. 189), and demonstrated in *Davis* v. *Zimmerman* (91 Hun, 489). Each man would be compelled to bring a separate action every time he was discharged. An action at law, especially against an unincorporated association, would ordinarily do no good, and in most cases ruin would anticipate relief. Damages would not adequately redress the wrong, and the mere statement of the facts

shows the impossibility of adequately measuring the damages in this class of actions. That damages were sustained is clear, but what evidence can prove the amount, and what intelligence is keen enough to resolve them into dollars and cents? Unless equity will take jurisdiction the wrong done is practically without a remedy. Unlawful combinations of capital are restrained without hesitation, and the same test of illegality should be applied to combinations of labor, for both are equal before the law, and both are covered by the same statute. (L. 1897, ch. 383 ; L. 1899, ch. 690.) The prejudice, said to exist in some minds against interference by courts of equity in labor disputes, should not be heeded, for if upon well-settled principles the courts have jurisdiction, they must exercise it, or refuse to do their duty. Public opinion may express itself in legislation, but not in judicial decisions.

The fact that a lawful strike inflicts injury upon the employer is not controlling. As was said by a recent writer upon the subject : " The courts recognize the right of workingmen to combine together for the purpose of bettering their condition, and in endeavoring to attain their object they may inflict more or less inconvenience and damages upon the employer ; but a threat to strike unless their wages are advanced is something very different from a threat to strike unless workmen who are not members of the combination are discharged. In either case the inconvenience and damage inflicted upon the employer is the same ; but in the one case the means used are to attain a legitimate purpose, namely, the advancement of their own wages, and the injury inflicted is no more than is lawfully incidental to the enjoyment of their own legal rights. In the other case the object sought is the injury of a third party ; and while it may be argued that indirectly the discharge of the non-union employee will strengthen and benefit the union and thereby indirectly benefit the union workmen, the benefit to the members of the combination is so remote, as compared to the direct and immediate injury inflicted upon the non-union workmen, that the law does not look beyond the immediate loss and damage to the innocent

parties, to the remote benefits that might result to the union."
(1 Eddy on Combinations, 416.)

The conclusions I have announced are supported by the weight of authority in this country and in England. The leading case in this state is controlling in principle and requires a reversal of the order appealed from. (*Curran* v. *Galen*, 152 N. Y. 33.) The plaintiff in that case alleged in his complaint that the defendants wrongfully conspired to injure him and take away his means of earning a livelihood; that they threatened to accomplish this unless he would join their association; that in pursuance of the conspiracy, "upon plaintiff's refusing to become a member of said association," the defendants "made complaint to the plaintiff's employers and forced them to discharge him from their employ, and, by false and malicious reports in regard to him, sought to bring him into ill-repute with members of his trade and employers and to prevent him from prosecuting his trade and earning a livelihood." The answer set forth an agreement between a brewer's association and a labor organization, of which defendants were members, to the effect that all employees of the brewery companies belonging to the former should be members of the latter, and that no employee should work for a longer period than four weeks without becoming a member. It was further alleged that the plaintiff was retained in the employment of one of the brewing companies for more than four weeks after he was notified of the provisions of said agreement requiring him to become a member of the local assembly; that the defendants requested him to become a member and on his refusal to comply, they, through their committee, notified the officers of said company that the plaintiff, after repeated requests, had refused for more than four weeks to become a member of said assembly, and that they did so solely in pursuance of said agreement and in accordance with the terms thereof, without intent or purpose to injure plaintiff in any way.

The plaintiff demurred to this defense upon the ground that it was insufficient, in law, upon the face thereof. The demur-

rer was sustained in all the courts.    (77 Hun, 610; 152 N. Y. 33.)    All the judges who sat in this court united with Judge Gray in saying that " Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper, or to restrict that freedom, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization and to come under its rules and conditions, under the penalty of the loss of their position, and of deprivation of employment, then that purpose seems clearly unlawful and militates against the spirit of our government and the nature of our institutions.    The effectuation of such a purpose would conflict with that principle of public policy which prohibits monopolies and exclusive privileges.    It would tend to deprive the public of the services of men in useful employment and capacities.    It would, to use the language of Mr. Justice Barrett in *People ex rel. Gill* v. *Smith* (5 N. Y. Cr. Rep. at p. 513), ' impoverish and crush a citizen for no reason connected in the slightest degree with the advancement of wages or the maintenance of the rate.' "

The plaintiff, in a very recent case in England, employed non-union men, and after trying in vain to have them admitted to the union, was told by its president that unless he discharged them his meat would be stopped at one Munce's, who had been getting about £30 worth weekly from him for twenty years, although there was no permanent contract between them.    Upon his refusing to discharge, the defendants, who were officers and members of the union, threatened to instruct Munce's employees to cease work unless he complied with their request.    The plaintiff still refused, whereupon Munce informed him that he need not send any more meat unless he arranged with the union, as his men had been ordered to quit work, and thereupon Munce ceased to deal with him.    There was a recovery by the plaintiff, which was sustained by all the appellate courts.    (*Leathem* v. *Craig*, 2 I. R. [1899] 667; *Quinn* v. *Leathem*, L. R. [App. Cas. 1901]

495.) Five concurring opinions were written in the House of Lords, which unanimously held that "a combination of two or more, without justification or excuse, to injure a man in his trade by inducing his customers or servants to break their contracts with him, or not to deal with him, or continue in his employment, is, if it results in damage to him, actionable."

The earlier case of *Allen* v. *Flood* (L. R. [App. Cas. 1898] 1), upon which the Appellate Division relied in rendering the judgment now before us, was carefully limited and explained, if not virtually overruled.

The English cases were so thoroughly reviewed that it is unnecessary to make further reference to them. Among other things, it was said : " He (referring to the plaintiff) was at liberty to earn his own living in his own way, provided he did not violate some special law prohibiting him from so doing, and provided he did not infringe the rights of other people. This liberty involved liberty to deal with other persons who were willing to deal with him. This liberty is a right recognized by law ; its correlative is the general duty of everyone not to prevent the free exercise of this liberty, except so far as his own liberty of action may justify him in so doing. But a person's liberty or right to deal with others is nugatory, unless they are at liberty to deal with him if they choose to do so. Any interference with their liberty to deal with him affects him. If such interference is justifiable in point of law, he has no redress. Again, if such interference is unlawful, the only person who can sue in respect of it is, as a rule, the person immediately affected by it ; another who suffers by it has usually no redress ; the damage to him is too remote, and it would be obviously practically impossible and highly inconvenient to give legal redress to all who suffer from such wrongs. But if the interference is wrongful and is intended to damage a third person, and he is damaged in fact, in other words, if he is wrongfully and intentionally struck at through others and is thereby damnified, the whole aspect of the case is changed ; the wrong done to others reaches him, his rights are infringed, although indirectly, and damage to

him is not remote or unforeseen, but is the direct consequence of what has been done. Our law, as I understand it, is not so defective as to refuse him a remedy by an action under such circumstances." This decision was not founded upon ancient statutes, as some of the early English cases are, but upon the common law.

See, also, the opinion in *Taff Vale Ry.* v. *Amalgamated Society* (L. R. [App. Cas. 1901] 431), which had not been published when the judgment in *Quinn* v. *Leathem* was pronounced.

The position of the Federal courts and those of most of the states is to the same effect. (*Old Dominion S. S. Co.* v. *McKenna*, 30 Fed. Rep. 48; *Casey* v. *Cincinnati Typographical Union*, 45 Fed. Rep. 135; *Hopkins* v. *Oxley Stove Co.*, 83 Fed. Rep. 916; *In re Debs*, 158 U. S. 564; *Plant* v. *Woods*, 176 Mass. 492; *State* v. *Donaldson*, 32 N. J. L. 151; *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101; *Longshore Printing Co.* v. *Howell*, 26 Oregon, 527; *State* v. *Glidden*, 55 Conn. 46; *Crump* v. *Commonwealth*, 84 Va. 927; *State* v. *Stewart*, 59 Vt. 273; *Doremus* v. *Hennessy*, 62 Ill. App. 391; *State ex rel. Durner* v. *Huegin*, 85 N. W. Rep. 1046; *Chipley* v. *Atkinson*, 23 Fla. 206; *Lucke* v. *Clothing Cutters*, 77 Md. 396; *Murdock* v. *Walker*, 152 Pa. St. 595; *Beck* v. *Railway Teamsters Protective Union*, 118 Mich. 497.)

I add to the discussion of the common law governing the subject a quotation from the statute against crimes in this state, as indicating the policy of the law : "If two or more persons conspire,   *   *   *   to prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements or property, belonging to or used by another, or with the use or employment thereof, *   *   *. each of them is guilty of a misdemeanor." (Penal Code, § 168.)

I think that the action of the defendants was unlawful and was properly restrained, but the injunction in the form granted is too broad and requires modification. It prevents the defend-

ants "from coercing or obtaining by command, threats, strikes *or otherwise* the dismissal or discharge by any employer, contractor or owner, of the members of the plaintiff corporation," etc. It is not limited to coercion, but prevents the defendant from obtaining not simply by command, threats, etc., *but by any means,* the discharge of the plaintiffs. This might prevent fair persuasion or solicitation, which the defendants may resort to. While this might have been corrected by motion at Special Term, for the decision of the trial justice does not warrant it, it may be corrected upon appeal.

The order of the Appellate Division so far as appealed from should be reversed and the judgment of the Special Term modified by striking out the words "or otherwise" therefrom, and as modified affirmed, with costs to the appellant in all courts.

O'BRIEN, HAIGHT, JJ., (and GRAY, J., in memorandum), concur with PARKER, Ch. J.; BARTLETT and MARTIN, JJ., concur with VANN, J.

Ordered accordingly.