(68 Misc. Rep. 528.)

## SCHWARCZ v. INTERNATIONAL LADIES' GARMENT WORKERS' UNION et al.

(Supreme Court, Special Term, New York County. August 28, 1910.)

1. ASSOCIATIONS (§ 20*)—CAPACITY TO SUE.

Code Civ. Proc. § 1919, permitting suit to be brought in the name of the president or treasurer of an unincorporated association, and providing that any company of persons which has such an officer shall be deemed such an association, authorizes suit by a protective association of manufacturers.

[Ed. Note.—For other cases, see Associations, Cent. Dig. §§ 36–43; Dec. Dig. § 20.*]

2. EQUITY (§ 51*)—MULTIPLICITY OF SUITS—PARTIES.

To avoid a multiplicity of suits, all the members of a protective association of manufacturers might join in a suit to enjoin interference with their affairs by a trade union, where the wrongful acts relied on are directed alike against each of them, and where proof to sustain a separate action brought by any one of them would be relevant in a similar action brought by any other member.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 167–171; Dec. Dig. § 51.*]

3. COURTS (§ 91*)—APPELLATE DECISIONS.

The latest rule laid down by the Court of Appeals must be regarded as the law on a given subject.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 325, 326; Dec. Dig. § 91.*]

4. INJUNCTION (§ 101*)—UNLAWFUL ACTS—STRIKES.

A strike ordered by a trade union to drive nonunion employés out of the trade in the borough unless they join the union is against public policy and unlawful, and will afford ground for injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 174, 175; Dec. Dig. § 101.*]

5. CONSPIRACY (§ 8*)—CONSPIRACIES—STRIKES.

At common law, civil conspiracy, to compel manufacturers to employ union labor only, was established by showing that a strike among their employés was ordered to drive nonunion employés out of the trade in the borough, unless they joined unions, and by a showing that defendants instigated and committed violence, disorder, and threats against the manufacturers and their employés.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 7–11; Dec. Dig. § 8.*]

6. CONSPIRACY (§ 8*)—PICKETING AND PATROLLING—LAWFULNESS.

Picketing and patrolling by union employés are lawful when not accompanied by violence and intimidation, but not when in aid of an unlawful object.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 7–11; Dec. Dig. § 8.*]

7. INJUNCTION (§ 136*)—LABOR STRIKES—TEMPORARY INJUNCTION—GROUNDS.

A temporary injunction lies at the suit of manufacturers to restrain picketing and patrolling and violence, threats, and annoyance to their workmen and prospective workmen in aid of an unlawful conspiracy and to restrain opprobrious epithets and language directed at the manufacturers and their employés, tending to provoke a breach of the peace; but not to restrain acts not threatened, such as issuing circulars or holding public meetings.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. § 136.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by Max M. Schwarcz, treasurer of the Cloak, Suit & Skirt Manufacturers' Protective Association, against the International Ladies' Garment Workers' Union and others. On motion to continue a temporary injunction. Order directed.

Julius Henry Cohen, for plaintiff.
Meyer London, for defendants.

GOFF, J. Plaintiff moves to continue a preliminary restraining order which enjoins defendants from interfering with the members of plaintiff's association by intimidation, threats, force, or fraud, and which also directs defendants to show cause why an order should not be granted pendente lite further restraining them from acts in aid of any conspiracy or combination, alleged to exist, to compel the members of plaintiff's association to employ only members of the defendant labor union. The motion comes on to be heard upon the order to show cause, summons, verified complaint, and moving affidavits and answers and affidavits in opposition.

Plaintiff's association is composed of 138 individuals and firms or corporations, all of whom are named in the complaint, and who are engaged in the Borough of Manhattan and City of New York in the manufacture and sale of tailored garments for women. These business houses are loosely associated under a mutual promise to endeavor to adjust shop grievances, improve sanitary conditions in their shops, not to enter into any agreement which shall involve surrender or control of their shops to any group of men, to promote peace in the continuance of the business and to join in an endeavor to provide protection against physical violence to those ready and willing to work in their factories. The defendant, International Ladies' Garment Workers' Union, is a federation of labor unions. The other defendant unions are nine branches of the federation, known as local unions and composed of operatives in one branch of the tailoring trade, namely, the manufacture of cloaks and skirts for women. The individual defendants were members of a committee for the unions who participated in a conference with a committee for plaintiff's association.

Many former employés of the manufacturers are now out on strike under the following circumstances: On July 2 and 3, 1910, the unions declared for a general strike by a vote of 18,776 for the proposition to about 500 against it, and, pursuant thereto, on July 7, 1910, they issued a circular directing the members of defendant local unions to stop work, although the manufacturers had received no previous statement of grievances nor demands. Pursuant to that notice 50,000 employés left the shops at 2 o'clock on the same day.

Immediately following the call of the strike, on July 7, 1910, the unions demanded of all the manufacturers in the trade that they enter into a written agreement between the several individual manufacturers, as parties of the first part, and the Joint Board of Cloak and Skirt Makers' Unions, as attorney in fact for the defendant locals, parties of the second part. The terms of the proposed agreement provided for its continuance in operation for one year, and contained provisions for the adjustment of many details in the relations between employers and employés, among others, that the manufac-

turers should make no contract with their employés individually, but only with the union, which was to be credited with work done by its members and debited with payments made to them, and that none but members of the locals should be employed to do the work.

On July 24, 1910, the Joint Board of the Cloak and Skirt Makers' Unions of New York submitted to the manufacturers a proposal for a conference which contained this statement: "All of these officers" (viz.: of the union) "understand fully that under this proposal the closed shop is not a subject which can be discussed at the conference." The manufacturers accepted this proposal. On July 28 a committee of ten for the manufacturers met a committee of like number for the unions, the last-named representatives being the individual defendants herein. The conferees discussed the subjects of electric power and materials, work in tenement houses, the exacting of security from employés, discrimination against union men, overtime and night work, holidays and Sundays, irregular payment of wages, subcontracting, the claim of low wages and sanitary conditions. As to all these subjects, mainly by concessions on the part of the manufacturers, the conferees were able to agree, except on the questions of wages and Saturday half holidays throughout the year, and a joint subcommittee was appointed to discuss these subjects. This subcommittee met and reported that the representatives of the unions had no power to make concessions. They desired to go back for power to submit them to arbitration. The conference then having proceeded to the questions of remedies, one of the committee of the unions argued that the first step was the union shop. The chairman ruled that that was a subject expressly excepted from the discussion. After an adjournment, and with the consent of both sides, the chairman made a proposition for an agreement that the manufacturers in the employment of labor should give the preference to union men when the union men should be equal in efficiency to any nonunion applicants. The committee for the unions deemed that suggestion impracticable. The conference adjourned. There were some further attempts to adjust their differences, which included an offer on the part of the manufacturers to submit the questions of wages and Saturday half holidays to arbitration, an offer which was refused by the unions. The negotiations were futile.

The members of plaintiff's association have large amounts of money invested in their businesses, which are jeopardized by the acts of defendants. Their season is now at its height, but they are unable to employ a sufficient number of workmen because the latter are in fear of physical injury from the strikers. The result is that the manufacturers cannot fill large orders which have been placed with them. They fear that orders will be canceled and the season's profits lost. The damages which they will suffer thereby cannot be estimated and are irreparable. Defendants have no financial responsibility.

A preliminary objection is made that the plaintiff has no standing in court for the reason that the objects of his alleged association are not disclosed in the complaint further than may be gathered from the terms of the mutual promise, which has been signed by its members. Code Civ. Proc. § 1919, permitting actions to be brought in the name

·of the president or treasurer of unincorporated associations, provides that:

"Any partnership or other company of persons which has a president or treasurer is deemed an association within the meaning of this section."

As this "company of persons" has a treasurer, it is entitled to sue. Indeed, all the members of the association might join as plaintiffs to prevent a multiplicity of. suits, since the wrongful acts alleged are directed alike. against each of them and proof to sustain a separate action brought by any one of them would be relevant to sustain a similar action brought by any other member of the association. Bradley v. Bradley, 53 App. Div. 29, 65 N. Y. Supp. 514, affirmed 165 N. Y. 183, 58 N. E. 887. The form of this action had the approval of the court in Typothetæ of the City of N. Y. v. N. Y. Typographical Union No. 6 (Sup.) 117 N. Y. Supp. 144.

By its affirmance (in 198 N. Y. 587, 92 N. E. ——) of the decision ·of the Appellate Division in McCord v. Thompson-Starrett Co., 129 App. Div. 130, 113 N. Y. Supp. 385, the Court of Appeals has declared that it is against the public policy of the state for employers who control practically the whole trade in a community to combine for the purpose of compelling workmen to join a particular union as a condition of employment. The result is a development of the doctrine ·enunciated in Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, in which case the court said:

"Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper or restrict that freedom and, through contracts or arrangements with the employers, to coerce other workingmen to become members of the organization and to come under its rules and conditions under the penalty of the loss of their position, and of deprivation of employment, then that purpose seems clearly unlawful and militates against the spirit of our government, and the nature of our institutions."

This language was quoted with approval by Ingraham, J., in his dissenting opinion in the McCord Case, but his dissent was not on the law as expounded, but on the question of the power of the board of governors of defendant association to issue an order requiring its members not to employ workmen who refused to join. "Such an agreement," said the court in Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, "when participated in by all or by a large proportion of employers, becomes oppressive and contrary to public policy, because it operates generally upon the craftsmen in the trade and imposes upon them as a penalty for refusing to join the favored union the practical impossibility of obtaining employment at their trade and thereby gaining a livelihood."

If the rule laid down in the McCord Case be the law, and it must be accepted as such, being the latest expression of the Court of Appeals, it must be applicable to workmen as well as to employers. It would be repugnant to reason to hold that it applies to one and not to the other. What the employers may not do the workmen may not do. If a combination of one to refuse employment except on condition ·of joining a union be against public policy, a combination of the other

to cause refusal of employment except on condition of joining a union is alike against public policy. This refusal was sought to be caused by the demand of the defendant unions made upon all the employers in the trade that the nonunion men already employed should be discharged in two weeks unless they joined the union. A discharge under such circumstances would be a refusal to employ. Appropriate here is the method of reasoning employed by Ward, J., in Irving v. Joint District Council (C. C.) 180 Fed. 896:

"To take the converse of the proposition, Will the defendants admit that employers may combine to prevent any employer from using union labor? May the employers agree not to sell to or contract with any one who deals with an employer who uses union labor? Either of these propositions is destructive of the right of free men to labor for or to employ the labor of any one the laborer or the employer wishes."

"Whatever one man may do alone," said Vann, J., in the National Protective Ass'n v. Cumming, 170 N. Y. 315, 321, 338, 63 N. E. 369, 376, 58 L. R. A. 135, 88 Am. St. Rep. 648), "he may do in combination with others, provided they have no unlawful object in view," a proposition which was assumed to be correct by Parker, C. J., writing the prevailing opinion. That the purpose of a combination is material in considering its legality has been held in Curran v. Galen, supra, Beattie v. Callanan, 82 App. Div. 7, 81 N. Y. Supp. 413, and Schlang v. Ladies Waist Makers' Union, 67 Misc. Rep. 221, 124 N. Y. Supp. 289.

That the purpose to be considered is its immediate, not its ulterior, purpose, was held in Mills v. U. S. Printing Co., 99 App. Div. 605, 613, 91 N. Y. Supp. 185. In McCord v. Thompson-Starrett Co., supra, the illegal purpose of the combination to drive workmen into a particular union invalidated a bond given by one of its members to secure obedience to orders of the association. There may have been an ulterior purpose of the combination to protect its members against blackmail and extortion. That was a legal purpose, but did not validate the bond in suit.

The primary purpose of this strike is not to better the condition of the workmen, but it is to deprive other men of the opportunity to exercise their right to work and to drive them from an industry in which, by labor, they may have acquired skill, and which they have a right to pursue to gain a livelihood, without being subjected to the doing of things which may be disagreeable or repugnant. That this is the motive which animates the combination of defendants is clear from the correspondence, the negotiations, the conferences, and the acts and conduct disclosed in papers before the court. At the conference, the manufacturers conceded all demands of the unions, except that they proposed to arbitrate the questions of wages and Saturday half holidays throughout the year and except that they refused to concede a closed shop. Their offer of arbitration was refused. Some 10 days after negotiations had been discontinued, counsel for the unions made a proposition to one of the manufacturers, looking towards a settlement of the whole controversy, as follows:

"The association is to obligate each of its members to employ union men as long as the union will be able to furnish union men who can do the work

properly.  Within two weeks the non-union men shall join the union.  * * *
I am certain an agreement will be reached on all other matters."

In insisting upon the closed shop it was doubtless the intention of
the union to get the whip hand of the manufacturers by perfecting a
powerful organization.  That agency would thereafter insure respect
for their demands for a continuance of the wages and hours which the
manufacturers are now ready to concede, but here, as in the McCord
Case, the ulterior purpose of the union is immaterial if the immediate
purpose is unlawful.  That it is unlawful has been shown.

The distinction between the present case and National Protective
Association v. Cumming, supra, is twofold.  In the National Pro-
tective Association Case there was no proof of illegal motive.  It had
not been found at Special Term and the Court of Appeals could not
infer it, while here the motive is found to be illegal.  It is distin-
guishable again in that there was no wide combination to drive non-
union men out of their trade in a community.  Here the combination
is directed against every nonunion man in the trade in the borough of
Manhattan.

In aid of their purpose, defendants have employed illegal means.
From the inception of the strike until the present day members of the
unions who were formerly employés of members of plaintiff's asso-
ciation have interfered with the business of the manufacturers by
forcible entry of the shops and destruction of property therein, as-
saults and batteries of a serious nature upon employés who refused
to stop work, threats to employés who were not unionists to beat or
kill them, similar threats to wives and members of the families of
such employés, use of opprobrious epithets and picketing the streets
with unruly throngs.  At large expense, the manufacturers have been
obliged to hire guards to conduct their employés to and from their
homes or to provide sleeping accommodations for them in their shops.
These facts are fully attested by over 50 affidavits of employés and
manufacturers who have been threatened or whose places of business
have been forcibly entered and by the record of testimony in police
courts.  The affidavits show 25 cases of assault and battery committed
by strikers upon employés by blows with fists, feet, and blunt in-
struments, sending several injured persons to the hospital.  There
are seven records of conviction of strikers in the police courts for
such assaults and batteries.  The fact that these lawless acts have
been committed by strikers appears by the affidavits of those who
have recognized them as former employés and from the testimony of
convicted persons in the police courts that they were strikers and that
their acts were in aid of the strike.  One employé was beaten in a
hall occupied by strikers.  Two employés were summoned to Beetho-
ven Hall, said to be the strikers' headquarters.  There they met a
person who represented himself to be secretary of one of the unions
and who warned them to stop work.  Subsequently they were threat-
ened by strikers with bodily injury if they should not stop work, and
they have stopped because they are in fear.  The fines of strikers in
the police courts have been paid by one Grossman, who said that he
was employed by the unions.  They were defended by one Greenberg,
a lawyer, who said that he also was employed by the unions.

·These various allegations in the moving affidavits are not denied by· defendants, except that the individual defendants deny that they per-· sonally resorted to or advised violence, but, on the contrary, allege that they gathered the strikers unto halls and counseled peace, and defendants Dyche, Schlessinger, Rosenberg, and Lennon allege that the unlawful acts were, done solely by strikebreakers and union sympathizers who are not members of the unions. They allege that every officer of every organization involved in this strike has used his best efforts to prevent disorder. They do not deny the particular allegations of the moving affidavit that Grossman and Greenberg were employed by the unions or that Beethoven Hall, where two employés were directed not to return to work, is a union headquarters, nor do they allege that any striker who has been found guilty of disorder in the police courts has been disciplined or even reprimanded. If the unions have not formally directed a systematic course of aggression by criminal acts, the members of the unions, acting in concert, have connived at, condoned and morally supported such acts on the part of many of their members, in pursuance of a common object.

A common-law, civil conspiracy having been shown by overt unlawful acts, done in pursuance of an unlawful object, it remains only to consider the breadth of the temporary injunction to be issued. The court cannot compel workmen to return to work. It should restrain all picketing and patrolling, which, though lawful where not accompanied by violence and intimidation, are unlawful where in aid of an unlawful object. It should, as a matter of course, restrain violence, threats to workmen and intending workmen, and, against their will, following them, persisting in talking to them or visiting at their houses, and it should restrain the use of opprobrious epithets and language calculated to provoke a breach of the peace directed to members of plaintiff's association and its workmen, but no order will issue to restrain acts which are not shown by the moving papers to have been threatened, such as the issuance of circulars or holding of public meetings; nor will·the court, in the exercise of its discretion at this time, restrain the free expression of opinion. No injunction will issue against the individual defendants.

Settle order in conformity with this opinion on notice.