Walter A. Wood Mowing and Reaping Machine Company, Plaintiff, *v.* Thomas H. Toohey et al., Defendants.

(Supreme Court, Rensselaer Special Term, January, 1921.)

Injunctions — when motion to vacate a temporary injunction granted — labor unions — meaning of word "picketing" — damages.

Employees on strike may employ persuasion and peaceable means to keep non-union men from taking their places, and the fact that the employer is irreparably damaged as an incident of picketing by the strikers and that it has no adequate remedy at law does not deprive the strikers of their legal right to "picket," providing there is no malice and no violence. (P. 188.)

Supreme Court, January, 1921.        [Vol. 114.

A motion to vacate a temporary injunction principally against "picketing" granted in an action brought for a permanent injunction against certain workmen of the plaintiff, out on strike, granted, with admonition to defendants that any excesses or violence or depredations or destruction of property will result in another injunction, *instanter*.   (P. 197.)

ACTION to obtain a permanent injunction.

George E. Greene (Alden Chester, of counsel), for plaintiff.

William A. Cahill (Alvin E. Mambert, of counsel), for defendants.

HOWARD, J. This action is brought to obtain a permanent injunction against certain working men who are out on a strike, and against other persons who are not defendants. A sweeping temporary injunction, principally against " picketing," has been obtained and this is a motion to modify or vacate it.

More than half of the complaint is devoted to a history of the strike and an attempt to establish that it was unjustified. It may have been unjustified, but that is of no importance here unless it was called to gratify malice and for the sole purpose of injuring the plaintiff's business or property. The strike was precipitated by the discharge of Toohey, one of the workmen in the plaintiff's plant. The union contends that he was unjustly discriminated against. The plaintiff denies this. If discrimination was the reason why the men went out the strike was lawful, for a labor union has a right to strike " to secure the re-employment of a member they regard as having been improperly discharged." *Nat. Pro. Assn.* v. *Cumming*, 170 N. Y. 322. Workingmen have an absolute right to strike. That is settled beyond peradventure in this state. They may state their reasons or

not, just as they please; and their reasons, if they do state them, '' may seem inadequate to others, but if it seems to be in their interest as members of an organization to refuse longer to work, it is their legal right to stop.'' *Nat. Pro. Assn.* v. *Cumming, supra.*

And laboring men not only have the right to strike, that is to quit work, but they have the right to persuade others to strike and to attempt to persuade others not to take their places. In order to do this the strikers must, of course, be permitted to talk to their fellow workmen and to the men who are about to take their places, otherwise there could be no persuasion; for how can one man persuade another unless he talks to him? The strikers must not, however, resort to violence or intimidation, for the non-union man has as much right to work as the union man has to strike. These are axioms. They are principles which have long been inbedded in the law.

The strikers are accused of '' picketing;'' in fact that is the one great grievance set forth in the complaint. But suppose they are picketing, what of that? They have as much right to picket as to strike, providing that they do not resort to threats or violence. Picketing simply means standing along the highways of approach, or near the entrances to the plant, in time of strike, for the purpose of observing who is working and of attempting to persuade them to quit. Non-union laboring men have a right to work and to go to and come from the shop unmolested, and corporations have a right to employ them, and any attempt on the part of strikers to interfere with these rights by coercion or intimidation, or by blockading the roads, or by compelling the non-union men to run the gauntlet, is unlawful; but I find nothing here which amounts to any such condition. A few sporadic instances of indiscreet language and of vulgarity are pointed out,

but the plaintiff's affidavits show that the non-union men were in no manner frightened or cowed by this, notwithstanding that many of them claim to have been put in fear, and that in most cases they displayed a courage and defiance and employed language which fully matched the temper and talk of the strikers. It is the law of this state, so far as the question has been settled, that strikers may employ persuasion and peaceable means to keep non-union men from taking their places; and the fact that the plaintiff is irreparably damaged, as an incident of the picketing, and that it has no adequate remedy at law, does not deprive the defendants of the right to picket, providing there is no malice and no violence.

This rule, which must, I believe, at last everywhere prevail, has just recently been firmly planted in the statutes of the United States. In other words picketing has been legalized by congress. The right to picket is, therefore, no longer a debatable question in the Federal jurisdiction. The Clayton Act, so-called, enacted October 15, 1914, provides that no injunction order " shall prohibit any person or persons, whether singly or in concert, from  *  *  *  ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be for the purpose  *  *  * of peaceably persuading any person to work or to abstain from working;  *  *  *  nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

Thus we find the right to " picket " definitely sanctioned and rooted in the statute laws of the Federal government. This enactment does not, of course, control the courts of the state of New York, in a case of this character, but it does put into Federal statutory

form the law of this state as propounded by its ablest
jurists.  It also sweeps away completely, from consid-
eration here, all that has been previously written by
the Federal courts in opposition to picketing, includ-
ing *Atchison, T. & S. F. Ry. Co.* v. *Gee,* 139 Fed. Repr.
582, cited by the plaintiff.  And not only that, but it
sets forth in bold certain statutory language, the trend
of modern thought against injunctions in labor dis-
putes.  The Clayton Act has in no degree been devital-
ized, as between the " employer and the employees,"
by the decision of the Supreme Court of the United
States in *Duplex Printing Press Co.* v. *Deering,* handed
down January 3, 1921.  That case went off on another
theory.

Judge Andrews, now on the Court of Appeals, sit-
ting then at Special Term, in a well-considered opin-
ion, the best I have read on the subject, correctly sets
forth the law of this state on picketing.  He said:
" Mere picketing, therefore, if it is peaceful, if there
is no threat or intimidation, if it is confined to simple
persuasion, I do not regard in any sense as unlawful,
whatever may be the motive of the picketers." *Foster*
v. *Retail Clerks' Protective Assn.,* 39 Misc. Rep. 48,
57.  This is sound.  It is just.  It is the law.  It must
forever remain the law until liberty of speech ceases
to be a human right.

If, then, it is the law in this state that strikers on
picket duty may use " persuasion," what is persua-
sion?  What language is permitted?  What is prohib-
ited?  The nomenclature of the strike is not the lan-
guage of the parlor.  Men become earnest and excited
and vigorous at such times.  A vital principle is at
stake.  It is not within the limits of human nature to
remain calm and gentle under such circumstances.
The fervor of argument is upon them; the stimulus
of battle.  They forget etiquette and grammar.  They

employ strong language.  Sometimes they go beyond the borders of decorum.  But so do men in all walks of life.  Instigated by emotion and impelled by deep conviction men always employ strong words.  This happens during political campaigns, and on election day, and even in the court room while lawyers are addressing the bench.  Men gesticulate, on such occasions, and become excited and demonstrative.

Must laboring men be held down to a more stringent rule?  Must they be under constant restraint?  Are they forced to be placid in the hour of contention?  It is well, perhaps, to be so, but does the law demand it?  I think not.  Strikers may talk in their own language; the plain, common, strong, everyday language of the laboring man.

"A peaceable and orderly strike  *  *  *  is not a violation of law."  *Nat. Pro. Assn.* v. *Cumming, supra.* The plaintiff contends, however, in addition to the alleged illegal picketing of which it complains, that this strike is not peaceable and orderly, but violent, disorderly and criminal.  Let us see.

Stripped of its verbiage, generalities and conclusions, the complaint seems remarkably barren.  The pleading and affidavits show that the word " scab " has been used three times, I think, and there has been some profanity and some vulgarity, and there are two or three expressions which might be construed into threats.  Otherwise there is nothing, barring the allegations which in no wise appertain to the defendants, and to which I shall refer later.  Not one act of violence or disorder has been traced to the door of any defendant; not an assault, not an arrest, not a shot, not a blow, not a menace.

Much importance is attached to the fact, if it be a fact, that some of the defendants on a few occasions used the word " scab."  I cannot feel myself shocked

by that word. The law, although, perhaps, deprecating its use, is not so sensitive as to be outraged by it. The word is coarse and offensive, to be sure, but it carries with it no import of infamy or crime. Its meaning is perfectly well known and its use is very common. Webster gives this definition of the word: "A working man who works for lower wages than, or under conditions contrary to, those prescribed by the trade union; also, one who takes the place of a working man on a strike." This definition embraces no thought of violence, no infraction of the law, no threat, no menace. Why should this word be especially tabooed? It is offensive, beyond question, and perhaps opprobrious. It would be better unsaid, but why should the court enjoin the strikers from using this particular word, or enjoin them from anything because they have used it? There is no reason, as I comprehend the rules of equity.

The plaintiff points out certain expressions of the defendants which it construes into threats. Such a construction is too far-fetched to warrant the court in concurring with the plaintiff. These alleged threats are so vague in character and of such insignificance, in my estimation, that I shall pass over them all, except one, without comment.

The one I have in mind is this. During the progress of the strike a barn was burned. It was owned by one of the men who had continued to work in spite of the remonstrance of the strikers. No attempt is made to show that the fire was incendiary, and not even the finger of suspicion is pointed at any striker, except that previous to the fire one of the defendants is alleged to have said to the owner of the barn, " If you go to work you will be sorry, but it will be too late." The striker vigorously denies that he ever had any such conversation with the man; but assume that he

did, can we fairly spell out of these words a threat to burn the man's barn, or any other threat? It is nearly whimsical to attempt to import a sinister meaning to these words. This would be a flimsy foundation indeed for injunction.

Passing over these trivial features of the plaintiff's papers we come to the one central event relied upon by the plaintiff, and set forth in the complaint and repeated in the affidavits. It is the alleged assault upon the night fireman, coupled, the same evening, with the attempt to shoot the general superintendent. These events demand particular consideration, because without them the plaintiff's papers become nearly frivolous.

The plaintiff's night fireman alleges that on the night of November 12, 1920, he was assaulted. Nobody saw it, nobody corroborates the fireman's statement except that blood and bruises were seen on his head and face by others. His wounds were examined and described by Dr. Shaw, so that there can be no doubt that he was hurt in some manner. But assuming that the fireman told the exact truth about it all, how does that impugn the conduct of these defendants? How is the incident relevant here? The assailants are unknown. The fireman could not identify them. It may be assumed that he knew most of the strikers, at least by sight, yet the men who assaulted him were strangers to him. The defendants indignantly deny any complicity in the assault or knowledge of it. To charge this atrocity against them without proof would be monstrous. Not a rule ever known in law or equity would sanction it. The incident is wholly alien to this case.

On the same evening George N. Allen, the plaintiff's general superintendent, claims to have been fired upon. Nobody saw this assault although other people

heard the shots. Four bullets were fired at the super-intendent and immediately thereafter Allen showed people his hat through which a bullet had ploughed its way. But the would-be assassins are unknown. Not a fragment of evidence points towards the defendants. There is no nexus between the strikers and the felons. Nothing connects the defendants in any manner with this dastardly deed. They are strangers to the outrage. It is true that the event happened during the progress of the strike, but are workingmen on a strike to be charged without rhyme or reason with every crime committed in the neighborhood? If not, then how is the incident relevant here? Counsel cannot seriously urge this unidentified felony as a basis for injunction. Who is to be enjoined? Not innocent men, surely; not men against whom there is no evidence whatever, either of knowledge or complicity. Therefore, even if the event be taken as true, it counts for nothing here.

But the story cannot be accepted too implicitly by the court. Allen's testimony has been seriously shaken. He is arraigned as an impostor. It is charged that in West Virginia, in 1912, Allen enacted a spurious scene quite similar to this. There he claimed to have been assaulted, robbed, gagged and bound by footpads. Afterwards he signed a written confession, so the defendants allege, admitting that he had bound and gagged himself and "faked" the holdup. These grave charges against Allen are presented to the court, not by mere nondescripts, but by the affidavits of three public officials of Wheeling, West Virginia, and by a member of the bar of that city. One of these men is now sheriff of the county, one is a deputy sheriff and one is a member of the "plain clothes squad." At the time of the alleged holdup they each held office; one was the prosecuting attorney, one was

chief of police, one was a city detective and the other was a police officer, and they were the officials in charge of the prosecution of the supposed highwaymen. These men are trusted, experienced public servants and seem worthy of belief.

And the story is vouched for to some degree by the affidavit of Allen himself. It is true that he still insists that he "was actually assaulted and waylaid and seriously injured," but he admits that he was suspected of having framed up the robbery and that two detectives "put him through the third degree," and read a written statement over to him. And he does not dispute that the statement contained the matter set forth by the Wheeling officials but he says that he is now unable to recollect what it contained, and he seems to account for this failure of memory by saying that the detectives "grilled him until he hardly knew what he was about."

Equity requires those who seek equity to come into court with clean hands, but if this Wheeling story be true, Allen's hands are soiled nearly beyond purification. If the testimony of these accredited public officials of West Virginia is to be accepted, it utterly destroys the evidence of Allen and taints the plaintiff's whole case with fraud and imposition. This expression, however, is not intended in any manner to reflect upon the plaintiff's attorneys. They are men of the highest standing in their profession and I assume that they knew nothing whatever of Allen's previous history and nothing concerning the West Virginia episode until it was divulged by the defendants' affidavits.

The plaintiff's superintendent does not rest supine under this attack upon his character. In addition to his own vigorous denial he has presented an affidavit which shows that the records of the Ohio Valley Gen-

eral Hospital indicate that he was in fact a patient
at that institution from January 10, 1912, the date of
the alleged holdup, to January 15, 1912.  He has also
presented evidence from the Chase Motor Truck Com-
pany, and from Aurin A. Chase, its president, and
from Carleton A. Chase, president of the Fire Trust
and Deposit Company, that he is a man of capacity,
character and integrity.  These certificates of char-
acter show that the Chases, at least, reposed, and do
now repose, full faith and confidence in Allen.  Thus
a question is presented as to the credibility of the
plaintiff's general superintendent.

It is not, however, necessary to pass upon the ques-
tion here, or to hold that Allen is an impostor.  Accept-
ing all that he says as true his story reflects in no
manner upon the strikers.  It is wholly irrelevant to
this controversy; an utter nullity.  Therefore it must
be disregarded.

Eliminating then the attacks upon the night fireman
and the superintendent, what is left?  Without these
the strike has been uncommonly orderly and tem-
perate — almost tame.  This impression is particularly
confirmed by the affidavit of Corporal Harold C. Her-
rick, the officer in command of the state troopers called
to Hoosick Falls for the very purpose of watching the
strikers and preserving order.  After giving his
observations in some detail he concludes by saying
'' that the general conduct of the strikers at all times
during said period (twelve days) was beyond criti-
cism.''  The station agent of the Boston and Maine
Railroad, and the baggage master, and a newspaper
reporter, all disinterested spectators, concur with Cor-
poral Herrick in commending the quiet, orderly aspect
of the strike.

Denuded of all impertinent matter, therefore, and
reduced to a sediment, the charge against the working-

men is this: They have gone on a strike and have resorted to picketing; that is, they have been trying to persuade others not to take their places. This is the "head and front of their offending." This is not enough.

It is urged that the injunction will do no harm because the defendants are to be restrained only from doing unlawful acts and perpetrating crime. But the citizen cannot be restrained from doing an unlawful act until there is evidence that he intends to do such an act. It casts opprobrium upon a person to assume that he will commit crime. And, in any event, equity has no criminal jurisdiction. An injunction order is no menace to criminals. Felons cannot be deterred from crime by injunction. The Penal Law is a standing injunction against crime. The penalties for crime are tenfold more severe than the chastisement for contempt of court. If the defendants are committing crime, the quick, summary, regular remedy is arrest and prosecution.

Many publicists and some jurists have taken the position that injunctions ought never to issue in labor disputes. The congress of the United States has nearly said that. I should not want to go quite to that length. Lawlessness and violence ought, perhaps, in an extreme case, to be restrained by injunction, but the courts should not carelessly cast the weight of their mandates into the strife between employers and employees.

In an evenly balanced, bitter, long drawn out labor struggle, an edict of the court, leveled at the strikers, shakes the morale of the workingmen. This is not the purpose of an injunction, although it is frequently, and perhaps generally, the purpose of the employer who seeks it. The function of an injunction order in a labor dispute is to restrain lawlessness, when there is lawlessness, and when this is likely to cause irre-

parable damage. When there is no lawlessness, and no proper grounds to apprehend it, there should be no injunction. The courts do not take sides in this ceaseless struggle between capital and labor. They stand indifferent. They intervene only when the law is trampled upon. They interpose the arm of authority only to restrain those who invade the rights of others.

The moral effect of an injunction order in such cases is tremendous. At once it gives the impression in the community that the strikers have violated the law. The court seems to have taken a hand in the struggle. This is the laymen's view. The injunction, thus shaping public opinion, is often decisive.

In exercising its discretion the court cannot shut its eyes to this aspect of the case or ignore the far-reaching psychic effect of its mandate. Therefore, if equity is to be done, the greatest caution should be observed in issuing injunctions in strikes. There should be grave provocation. Strained constructions of the words employed by strikers is not enough. Surmise and suspicion are not sufficient. Unusual vigor of speech among the strikers, now and then, or groups of laborers assembled, here and there, will not suffice. Injunctions cannot rest in such grave controversies upon such trivial foundations. And of course it is idle to contend that the depredations of unidentified miscreants, or the crimes of unknown criminals, can move a court of equity to issue an injunction in any case against any citizen.

In view of this reasoning I have concluded that the injunction order should be vacated in every particular; but I think I ought to add that the defendants should not construe this as a grant of license to them. Any excesses or violence or depredations or destruction of property will result instantly in another injunction.

**Ordered accordingly.**